**IN THE COURT OF COMMON PLEAS OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

FREDERICK ENTERPRISES, INC.,  )
a Delaware Corporation,  )
                      )
       Plaintiff,  )
                      )
       v.  )      C.A. No. CPU4-14-000503
                      )
ERIC SHEEHAN,  )
                      )
       Defendant.  )

Submitted: February 10, 2015
Decided: March 12, 2015

Gary A. Bryde, Esquire
Stone Mill Office Park
724 Yorklyn Road, Ste. 100
Hockessin, DE 19707
*Attorney for Plaintiff*

Victoria A. Petrone, Esquire
Logan & Petrone, LLC
100 West Commons Blvd., Ste. 300
New Castle, DE 19720
*Attorney for Defendant*

## ORDER ON DEFENDANT'S MOTION
## TO DISMISS AND DECISION AFTER TRIAL

Plaintiff Frederick Enterprises, Inc., brings this breach of contract action to recover a percentage of the proceeds from a life insurance policy governed by a restrictive bonus agreement. Trial was held on February 10, 2015. Before trial began, Defendant Eric Sheehan, through counsel, moved to dismiss the action based on a Statute of Frauds defense. This Court reserved decision on the issue. The Court heard testimony from five witnesses, and documents were received into evidence.[1] At the conclusion of trial, the Court reserved decision on Sheehan's motion to dismiss and took the matter under advisement. This is the Court's final decision and order.

---

[1] Plaintiff's Exhibits 1 through 11 and Defendant's Exhibit 1 were received into evidence.

## PROCEDURAL HISTORY

The relevant procedural facts are as follows: on February 25, 2014, Plaintiff Frederick Enterprises, Inc. ("FE") brought this breach of contract action against Defendant Eric Sheehan ("Sheehan") for his alleged breach of a restricted bonus agreement ("Agreement"). FE allege that the Agreement governs the disposition of Sheehan's life insurance policy ("Policy"). FE contend Sheehan surrendered the policy for its cash value without paying FE monies owed. After two attempts to collect the debt, FE filed this suit seeking $25,666.96 plus attorney's fees, costs, and post-judgment interest.

On April 9, 2014, Sheehan filed a motion to dismiss, alleging that the Agreement is unsigned, and that the complaint is barred by the Statute of Frauds because the Agreement is for more than one year. On May 16, 2014, Chief Judge Smalls denied Sheehan's motion to dismiss.

On July 6, 2014, Sheehan filed an answer admitting that he received the life insurance policy and that FE contacted him regarding the debt, but denying the remainder of the complaint. Trial was held on February 10, 2015. At the conclusion of trial, the Court reserved decision on Sheehan's motion to dismiss and took the matter under advisement.

## FACTS

Based on the testimony and evidence presented at the hearing, the Court finds the following facts:

Frederick Enterprises, Inc., is a company that provides heating, ventilation, and air conditioning services and repairs. Sheehan began working for FE in 1984, when he began as an

2

apprentice. After working his way through the ranks, Sheehan became the plumbing supervisor. Sheehan worked for FE continuously for thirty years until he chose to leave in August, 2013.

During periods when the business was doing well, FE awarded its management team with bonuses received in addition to annual pay.[2] However, because bonuses only issued when business was good, FE sought a better way to retain key employees, lower costs, and incentivize employee loyalty. Brian and Robert Frederick (collectively, "Fredericks"), respectively, the CEO and Vice President of FE, spoke to Laura Crean concerning this objective.[3] Crean suggested that FE create a restrictive bonus agreement, calling it "golden handcuffs".[4] The Fredericks agreed, and called a meeting ("Meeting") to discuss the Agreement.

The Meeting occurred in Fall 2009. The Fredericks, Sheehan, and John Ratcliffe, Jr., were present. The Fredericks offered the Agreement to Sheehan and Ratcliffe, and provided copies of the proposed agreement to them.[5] In its relevant parts, the Agreement set forth that FE would pay Policy premiums for the duration of the employee-signatory's "continued employment services" at FE.[6] In return, the employee-signatory would take steps necessary to apply for, and obtain policy coverage. Finally, the employee-signatory would repay FE a percentage of the cumulative premium payments made by FE into the Policy, according to a ten year vesting schedule depending on when, or if, the employee-signatory left FE's employ.[7]

---

[2] *See* Pl.'s Ex. 2. Sheehan testified that he received bonuses, but could not recall any amounts or years in which bonuses were issued. The Court does not find this testimony credible.

[3] Crean served as the financial advisor to FE, she also served as Sheehan's personal financial advisor.

[4] A restrictive bonus agreement can take many forms: in the instant case, the longer the employee remains "handcuffed" to the employer, the more the bonus grows; hence, the term "golden handcuffs."

[5] See Pl.'s Ex. 1. Sheehan again testified that he did not recall whether the meeting occurred, or whether the restrictive bonus agreement was discussed. In any event, Sheehan stated that he did not receive paperwork at the meeting. The Court does not find his testimony credible.

[6] *See* Pl.'s Ex. 1 Paragraph 3.

[7] *See* Pl.'s Ex. 1 Paragraph 5. It is important to note that this Agreement is valid so long as an employee remains employed at FE; be it one day after entering the Agreement or twenty years.

3

Sheehan never signed the Agreement; however, he retained the paperwork disseminated at the meeting for his attorney's review.

During March of 2010, Sheehan took the physical exam in order to begin the Policy. He met with Crean, who at the time was serving as his personal financial advisor, and went over the Policy's terms. Crean testified that Sheehan understood that the Policy was governed by the Agreement. In Crean's presence, Sheehan signed the policy application which twice referenced a "162 Executive Bonus Plan" ("Executive Plan").[8] Crean discussed with Sheehan the nature of the Executive Plan, its operation, and how it relates to the Agreement.[9] Additionally, Crean addressed the Policy illustration, which again referenced and explained the structure of the Agreement. The Policy issued in June of 2010 and FE made its last payment in August of 2013; FE paid thirty-eight monthly deposits of $833.34 into the Policy without missing a payment.[10]

In August of 2013, FE learned that Sheehan was leaving in order to start his own business. The Fredericks and Sheehan discussed the consequences of Sheehan's decision in relation to the Agreement's terms, specifically how his departure would trigger the Agreement's repayment provision.[11] At least twice, Sheehan acknowledged to the Fredericks, his obligations under the repayment provision of the Agreement.[12]

Next, Rockwell insurance brokers contacted the Fredericks, and advised that Sheehan would surrender the Policy for its cash value. The surrender required FE's consent, which was

---

[8] See Pl.'s Ex. 3, pp. 4-5. At the time that the policy was signed, the policy did not include a policy number or payments. Crean testified that this is because the policy had not yet taken effect.

[9] The Agreement in question is a 162 Executive Bonus Plan. Such a plan provides a cash bonus, funded by a life insurance policy to employees. The bonus amount is contingent upon vesting provisions drafted by an employer.

[10] Equal to $31,666.92 (38 x $833.34).

[11] See Pl.'s Ex. 1 Paragraph 5. Under the repayment provision Sheehan is obligated to pay FE a percentage of the cumulative premium payments made by FE according to an explicit vesting schedule. In this instance, because Sheehan left before the end of policy year four, he is to pay FE seventy percent of the cumulative premium payments made.

[12] Sheehan testified that he did not recall the terms of the restricted bonus agreement, that he never heard the term "golden handcuffs," and that he did not discuss the restricted bonus agreement with Crean, his personal financial advisor. The Court does not find this testimony credible, and accordingly does not give Sheehan's testimony much weight.

4

granted upon Sheehan's representation that he would pay the amount owed under the Agreement. Sheehan then cashed in the life insurance policy for $32,225.11[13] After two attempts to collect the debt went unanswered, FE filed this suit.

## PARTIES' CONTENTIONS

Plaintiff FE contends that since Defendant Sheehan left Plaintiff's employ, he is contractually bound by the Agreement to repay Plaintiff seventy percent of the cumulative policy premiums paid by Plaintiff to the insurance company.[14] In addition, Plaintiff seeks attorney's fees, costs, and post-judgment interest. Plaintiff alleges that Defendant, during his exit interview, acknowledged his obligations under the Agreement, despite not having signed it at any point between the Meeting and his departure.[15] Finally, Plaintiff avers that the Agreement is not subject to the Statute of Frauds.

As to the Statute of Frauds: Plaintiff first argues that although the Agreement was not signed, it remains enforceable because the Agreement could have been performed within one year and is therefore not within the Statute of Frauds. Second, Plaintiff argues that part performance, by both parties, altogether removes the Agreement from within the scope of the Statute of Frauds.

Defendant alleges that the Statute of Frauds renders the Agreement unenforceable.[16] Specifically, Defendant contends that because the Agreement was not to be performed within

---

[13] Sheehan was to remit $22,166.84 to FE under the Agreement.
[14] This amount is equal to total monthly premium payments made by Plaintiff, multiplied by the percentage Defendant is required to pay back ((38 x $833.34) x .7 = $22.166.84).
[15] At trial, multiple witnesses alleged that on more than one occasion, D acknowledged his obligation under the Agreement.
[16] 6 *Del. C.* § 2714(a).

5

one year's time it needs to be in writing *and* signed by the party against whom enforcement is sought. Since the Defendant did not sign the Agreement, Defendant alleges there is no contract to enforce.

## DISCUSSION

The Court will address Defendant's Motion to Dismiss and then issue its decision after trial.

## I. Motion to Dismiss

In considering motions to dismiss filed pursuant to *CCP Civil Rule* 12(b)(6), the Court must assume that all well-pleaded facts in the complaint are true.[17] The complaint should not be dismissed unless "the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[18]

Under 6 *Del. C.* § 2714(a), "No action shall be brought to charge any person upon any agreement made . . . that is not to be performed within the space of 1 year from the making thereof . . . unless the contract is reduced to writing, or some memorandum, or notes thereof, [which] are signed by the party to be charged therewith."[19] However, "[t]he statute [of frauds] does not extend to an agreement which may *by any possibility* be performed within a year, in accordance with the understanding and intention of the parties at the time when the agreement

---

[17] *Battista v. Chrysler Corp.*, 454 A.2d 286, 287 (Del. Super. 1982).
[18] *Id.* (citations omitted).
[19] 6 *Del. C.* § 2714(a).

6

was entered into."[20] Additionally, the Statute of Frauds does not restrict enforcement of an oral agreement otherwise within its provisions where there is evidence of actual part performance.[21] This theory derives from the notion that "acts of performance, even if incomplete, constitute substantial evidence that a contract actually exists."[22]

Defendant's Motion states that the Agreement "concerns a life insurance policy" in Defendant's name.[23] Defendant contends that the Agreement could not be performed within the span of one year because Plaintiff "promised . . . to pay life insurance premiums for at least ten years."[24] Finally, Defendant argues that due to Plaintiff's "promise," the Agreement could not be performed within one year, is subject to the Statute of Frauds, and must be reduced to writing and signed by the Defendant or else be unenforceable. The Motion concludes that the Plaintiff has failed to state a claim upon which relief can be granted because Plaintiff brought its breach of contract action based on an unsigned agreement.

Defendant has misread the terms of the Agreement. The Agreement does not contain language tending to indicate either party contemplated a contract lasting for a specific term. On the contrary, the Agreement's duration depends entirely upon Defendant's "continued employment services" at FE.[25] The Agreement specifies that FE's obligation to pay premiums ends after the date Defendant's employment terminates.[26] The only term subject to a time limit is Defendant's obligation to repay Plaintiff a percentage of the cumulative monthly premiums paid by Plaintiff into the Policy; this obligation ceases after ten years. Therefore, the Agreement could be performed within one year if Defendant terminated his employment at FE less than one

---

[20] *Haveg Corp. v. Guyer*, 211 A.2d 910, 912 (Del. 1965) (emphasis added).
[21] *Quillen v. Sayers*, 482 A.2d 744, 747 (Del. 1984).
[22] *Id.*
[23] D's Motion to Dismiss Paragraph 3.
[24] D's Motion to Dismiss Paragraph 7.
[25] Pl.'s Ex. 1 Paragraph 3.
[26] Pl.'s Ex. 1 Paragraph 2.

7

year after performance began. Because the Agreement does contemplate performance within one year's time, this Court finds it is not subject to the Statute of Frauds.

In addition, there was part, if not full performance by both parties. Defendant took the steps necessary to obtain the Policy by submitting an application and obtaining a physical. In return, Plaintiff fully performed its obligation by paying the Policy premium for as long as Defendant remained in Plaintiff's employ. The Policy issued in June of 2010 and Defendant's employment terminated in August of 2013; Plaintiff never missed a premium payment. Since Plaintiff made full performance by paying all Policy premiums, and Defendant made at least, partial performance by taking the steps necessary to obtain the Policy, the Doctrine of Part Performance also renders the Statute of Frauds inapplicable to this Agreement.

Assuming all well-pleaded facts are true, this Court finds that because the Agreement is not within the Statute of Frauds, it is reasonably conceivable that Defendant is subject to Plaintiff's breach of contract claim. Defendant's Motion is DENIED.

## II. Breach of Contract Claim

The Court already addressed Defendant's Statute of Fraud defense, determining it necessarily fails because the Agreement is not within the statute. Therefore, this Court will now discuss Plaintiff's breach of contract claim on the merits.

To prevail on a claim for breach of contract, a plaintiff must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) breach by defendant of an obligation imposed by the contract; and (3) plaintiff suffered damages as a result of that breach.[27]

## A.    A Contract Existed Between Plaintiff and Defendant

Based on the testimony and evidence admitted at trial, this Court finds that there exists a valid contract between Plaintiff and Defendant.  By their actions Plaintiff and Defendant demonstrated an intent to obligate one another within the framework of the Agreement; Defendant, by taking the requisite steps for the Policy to issue and by continuing his employment at FE, and Plaintiff by paying the Policy's monthly premiums of $833.34.

Although Defendant did not sign the Agreement, there is little doubt he was aware of his contractual obligations to Plaintiff when he applied for life insurance coverage under the Policy. Testimony of three witnesses confirms that at the Meeting copies of the Agreement were distributed to Defendant and John Ratcliffe.  Defendant testified that at the Meeting, Plaintiff had a "rough draft" of the Agreement but that no documents were distributed.[28]  Finally, the Agreement handed out at the Meeting clearly laid out, on its second page Defendant's repayment obligations.

Even if Defendant did not obtain a copy of the Agreement, Defendant was aware an agreement governed his Policy ownership.  Plaintiff's financial advisor, Laura Crean, testified that she sat down with Defendant when he signed the Policy application, which application twice

---

[27] *Gregory v. Frazer*, 2010 WL 4262030, *1 (Del. Com. Pl. Oct. 8, 2010); *VLIW Technology, LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).
[28] Even if Defendant is correct that the Agreement was not distributed, at the very least, it has been established that Defendant was aware that there was some kind of agreement that would govern his ownership of the Policy, and he was therefore on notice that said ownership would be limited by the Agreement's terms.

9

referred to a "162 Executive Bonus Plan."[29] Crean also testified that prior to his signing the Policy application, she had discussed with Defendant the nature of the Executive Plan, its operation, and how it relates to the Agreement. These discussions were centered around the Policy illustration, which itself warns that "this [bonus plan] restricts the employee's access to the policy cash value based on an agreed vesting schedule."[30] Crean testified that she explained to Defendant how the Agreement would govern Defendant's ownership of the Policy.

Although testifying he never had a copy of the Agreement and was therefore unaware of such Agreement - testimony conflicting with that of all other witnesses who were present at the Meeting - Defendant was warned by Crean that an agreement governed his ownership of the Policy. According to his own testimony, Defendant, without a copy of the Agreement, yet knowing an agreement governed his Policy, took the steps necessary to initiate policy coverage by signing an application and undergoing a physical in order for the insurance company to calculate its monthly premium. Taking all of this into account, Defendant was not "in the dark" as to the terms of the Agreement and had ample knowledge of its existence, this despite the fact he claims not to have had a copy. Therefore this Court finds that he entered into a valid contract with Plaintiff.

## B. Defendant Breached the Agreement

The Defendant did breach an obligation imposed by the Agreement's terms. Namely, his obligation to repay Plaintiff a percentage of the cumulative premiums it paid for the Policy.

---

[29] The 162 Executive Bonus Plan is a restricted bonus agreement. Typically, these bonus plans are funded by a life insurance policy and will restrict a policy owner's access to benefits. This framework mirrors that of the Agreement.

[30] Pl.'s Ex. 10

10

According to paragraph five of the Agreement: "the [Plaintiff] shall be reimbursed according to the below schedule if and only if the [employee]'s employment with the [Plaintiff] is terminated prior to the end of the tenth policy year."[31] The Policy issued in June of 2010, and Defendant left FE in August of 2013, during its third policy year. During his last two weeks of employment, Defendant and Plaintiff discussed how Defendant's departure triggered the Agreement's repayment provision; Defendant acknowledged his obligation.

Subsequent to his decision to leave, Defendant requested a full cash surrender of the Policy and was issued a check by the life insurance company for $32,225.11.[32] The Agreement's repayment schedule calls for Defendant to pay back seventy percent of the cumulative premiums paid by Plaintiff into the Policy. According to the record at trial, Plaintiff paid $31,666.92 into Defendant's policy. To date, Defendant has given no money to Plaintiff. Having not repaid Plaintiff any portion of monies owed under the express terms of the Agreement, Defendant is in breach.

## C. Damages

Owing to Defendant's breach, Plaintiff suffered damages equivalent to seventy percent of the amount of monthly premiums it paid into Defendant's Policy. Since the Policy issued in June of 2010 and terminated in September of 2013, Plaintiff made thirty-eight premium payments totaling $31,666.92. This Court finds that Plaintiff suffered damages totaling $22,166.84 plus attorney's fees, costs, and post-judgment interest.

---

[31] Pl.'s Ex. 1 Paragraph 5. In the Agreement, "terminated" contemplates both an employee leaving of his own accord, or by compulsion at FE's request.

[32] This check was issued with Plaintiff's consent, only after Defendant expressed understanding of his repayment obligations.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss is **DENIED**. Further, I conclude that there was a valid contract between Plaintiff and Defendant, which Defendant breached, resulting in damages to Plaintiff in the amount of $22,166.84. Defendant is ordered to pay Plaintiff $22,166.84 plus attorney's fees, costs, and post-judgment interest.

**IT IS SO ORDERED.**

_____
The Honorable Robert H. Surles,
Judge